## William H. Bartlett et al. v. Eleanor Wheeler.

1. CONTRACTS—*Retrospective Operation, How to Be Determined.*— A contract may have a retrospective operation, and whether it has or not is to be determined from the contract itself.

2. SAME—*Construction of an Executory, When Susceptible of Two Meanings.*—Where the words of an executory contract are susceptible to two meanings, and there is no evidence arising from the surrounding circumstances to throw light upon the intention of the parties, the more reasonable inference is that the contract was with reference to what was to take place after its making.

Debt.—Appeal from the Circuit Court of Livingston County; the Hon. GEORGE W. PATTON, Judge, presiding. Heard in this court at the April term, 1901. Affirmed. Opinion filed July 12, 1901.

Statement.—Declaration in debt. Plaintiffs complain that the defendant, on May 1, 1899, acknowledged herself to be held and bound to the plaintiffs in the sum of $2,000 upon the following condition: That if T. H. Wheeler should well and truly perform his contract with plaintiffs, " hereinafter set out," and upon the termination thereof, by limitation or otherwise, pay plaintiffs the money which may be due them, then the obligation to be void, otherwise to remain in full force and virtue. The contract referred to is as follows :

"THIS AGREEMENT, made this first day of May, 1899, between Bartlett, Frazier & Co., of Chicago, party of the first part, and T. H. Wheeler, grain buyer at Leeds, in the County of La Salle, State of Illinois, party of the second part,

WITNESSETH, That the party of the first part for and in consideration of the agreements hereinafter set forth, to be kept and maintained by the party of the second part, agrees to advance and loan to said party of the second part, such sums of money as said party of the second part shall

from time to time need for the purpose of assisting or enabling him to purchase and pay for ear and shelled corn, wheat, oats and other grain at the station of Leeds, Illinois, upon the terms and conditions following:

1st.   The party of the second part agrees that in purchasing grain at such station, he will purchase the same at the lowest possible price; and that he will at no time pay a higher or greater price therefor than shall be expressed and limited in the last advice by letter, telegram or telephone, which he shall have received from said party of the first part.

2d.   The party of the second part agrees that he will sell and deliver to the party of the first part, all the grain which he shall so purchase, at an advance over and above the purchase price thereof, of one cent per bushel, and that he will not buy, sell, weigh or handle to or for any other party or firm during the existence of this contract.   And said party of the first part agrees to purchase and receive all such grain at such advance per bushel, and to allow the proceeds thereof as a credit upon loans and advances made, as aforesaid, and if nothing shall be due thereon, to pay for same in cash.

3d.   The said party of the second part shall, each day, make detailed and itemized reports of all grain by him purchased, the price and prices paid therefor, and the place of delivery; and if any grain shall be contracted to be delivered in the future, the report shall state such fact, the names of the parties from whom purchased, the amount so purchased, the contract price thereof, and the time of delivery.   If any of the purchases shall be reported by telegraph or telephone they shall be confirmed by mail the same day.

4th.   All ear corn shall be delivered in cribs, to be furnished by said party of the first part, or on board cars, as they may direct; the shelled corn, wheat, oats and other small grain shall be delivered as directed by the party of the first part, either into warehouse, elevator, or on board cars at said station, billed and consigned as directed.   And the said party of the second part agrees to be ready at all times to deliver on board cars for said party of the first part, when called upon, the same quantity and quality of grain of the respective kinds that his reports and credits show he has received, contracted for and been paid for, said quantity to be determined by public elevator or actual railroad weights, and when such grain shall be shipped to interior points, he will guarantee weights to hold out at the

place of ultimate delivery, within one per cent on each car, of shipper's weight.

5th.  The party of the first part agrees to pay the necessary extra outlay of shelling and loading ear corn on car; but the party of the second part shall oversee such shelling and loading on cars without extra charge; and all small grain shall be weighed and delivered on cars for said party of the first part by said party of the second part without extra charge.

6th.  It is hereby understood and agreed between the parties that all grain purchased and delivered as aforesaid, or which shall have been reported by said party of the second part as having been purchased and delivered, or contracted for and not delivered, the proceeds of which, at the advanced prices as aforesaid, shall have been credited to the said party of the second part, shall belong to and be the property of the said party of the first part, and subject at all times to their order.  No such grain or ear corn shall be taken or withdrawn from storage or cribs for any purpose, except to load on cars under the directions of said party of the first part.

7th.  It is further understood and agreed that said party of the second part shall, by virtue hereof, have no authority to buy or sell or contract for the purchase or sale of any grain in the name or on account of the party of the first part; and that no agency is hereby created for the purchase or sale of grain, or for any other purpose whatever, save for the storing, oversight and shipment of grain as hereinbefore provided.

The party of the second part agrees to furnish elevator of ten M. bushels capacity, free of expense to party of the first part.  The party of the first part agrees to allow the party of the second part one-half cent per bushel for stored oats and one cent per bushel for ear corn as storage for grain carried outside of elevator.  The party of the first part agrees to allow the party of the second part one per cent shrinkage on stored oats carried longer than April 1, 1900, and three per cent on ear corn carried longer than May 1, 1900.  If, however, ear corn overruns, overrun shall belong to party of the first part.

This contract may be canceled by either party by giving sixty days' notice.

This agreement shall be and remain in force from the first day of May, 1899, until the first day of May, 1900."

The declaration further charges that plaintiffs, under

said contract, advanced said T. H. Wheeler such sums of money as said T. H. Wheeler from time to time needed for the purpose of assisting him to purchase and pay for grain at Leeds Station, Illinois; but that the said T. H. Wheeler, disregarding his obligation, failed to account to the plaintiffs for grain purchased by him and failed to account for money received. By reason of which breaches the said contract became forfeited, and thereby an action accrued to the plaintiffs to have of the defendant the sum of $2,000.

A. C. BALL and GEORGE P. MERRICK, attorneys for appellants.

REEVES & BOYS, attorneys for appellee.

MR. JUSTICE WATERMAN delivered the opinion of the court.

The court below held that the plaintiffs could recover only for grain received subsequent to the execution of the contract, which the said T. H. Wheeler had failed to account for; and so holding, under the evidence, it instructed the jury to find a verdict for the defendant.

The only dispute in this case is as to the construction of said contract, appellants holding that the obligee under the bond undertook that said T. H. Wheeler should faithfully account and pay for all grain which he had received under any contract made by him with appellee, whether said grain was received before or after the making of said contract. Appellants particularly call attention to clause four of the contract. The contract is to be construed as a whole, and a conclusion arrived at as to its true significance from an examination of every part of it. So doing, it will be found that almost every part of it clearly has reference to future transactions. The recitals are as to grain which he shall receive, and his undertakings as to what he will do. This language and other of the same kind runs so entirely through the contract that it is manifest that the undertaking thereby made was to faithfully account and pay for all grain that might thereafter be received; and consequently the undertaking of appellee by her bond was only for an

accounting by T. H. Wheeler for grain received by him subsequent to the making of said contract.

Undoubtedly a contract may have a retrospective operation. Whether it has or not is to be determined from the contract itself. Where the words of an executory contract are susceptible to two meanings, and there is no evidence arising from surrounding circumstances to throw light upon the intention of the parties, the more reasonable inference is that the contract was with reference to what was to take place after its making.

The judgment of the Circuit Court is affirmed.